# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>SIMEON REYES JUAREZ,<br><br>Appellant. | No. 53592-1-II<br><br><br><br>UNPUBLISHED OPINION |

CRUSER, J.—Simeon Reyes Juarez appeals three convictions for first degree rape of a child. He argues that (1) instructional error violated his right to be free from double jeopardy, (2) the prosecutor committed misconduct during closing argument, (3) two of his convictions were not supported by sufficient evidence, (4) his counsel was constitutionally ineffective, and (5) cumulative error deprived him of his right to a fair trial.

We hold that although the jury instructions were inadequate, Reyes Juarez was not subjected to multiple punishments for the same offense in violation of double jeopardy. Additionally, although the prosecutor improperly minimized his burden of proof during closing argument, Reyes Juarez waived any claim by failing to object below. Also, all of Reyes Juarez's convictions were supported by sufficient evidence, he fails to show that he received ineffective assistance of counsel on this record, and cumulative errors did not deprive him of a fair trial. Therefore, we affirm.

FACTS

NJV described Reyes Juarez as her "father's nephew," her godfather, and a "father figure" in her life. Report of Proceedings (RP) at 208, 231. Until spring 2017, Reyes Juarez lived with NJV's family. He lived with them for 11 years, and he had his own room in their four-bedroom home, right next to NJV's bedroom.

In 2018, NJV disclosed to her mother that Reyes Juarez had sexually abused her for years. NJV's mother took NJV to Behavioral Health Resources (BHR), "a community mental health resource agency," and a crisis worker there helped NJV and her mother report the allegations to law enforcement. *Id.* at 193. The State charged Reyes Juarez with three counts of first degree rape of a child.

TRIAL

A.    OPENING STATEMENT

In its opening statement, the State described the charges against Reyes Juarez as "[t]hree counts of rape of a child in the first degree said to have occurred separately but over the course of a period of time" between NJV's fifth and eleventh birthdays. *Id.* at 139. The State explained, "Despite the fact that . . . this sexual intercourse, this sexual contact, occurred frequently over a period of several years[, NJV] will be able to identify and describe for you three specific instances." *Id.* at 142-43. The State then briefly summarized the expected testimony for each of the three instances.

B.    WITNESS TESTIMONY

NJV's family testified at trial consistently with the facts described above. NJV's mother testified that she took her daughter to BHR after she disclosed being sexually abused, and she

described her daughter's demeanor at the time. The crisis worker at BHR who interviewed NJV and her mother also testified.

NJV testified that she recalled the sexual abuse starting when she was "around five and seven years old," or "around second or third grade . . . [f]irst or second grade." *Id.* at 210. She recalled early memories of Reyes Juarez "making [her] sit on his lap and just touching [her]." *Id.* at 212-13. She said that he would tell her she was attractive and buy her things. NJV testified that when she was younger, Reyes Juarez "called it a game" and told her, "When we . . . played like that, we weren't allowed to talk about it or tell anybody about it." *Id.* at 216.

NJV testified that Reyes Juarez would sexually abuse her "any time he got a chance," and she estimated that it happened "a couple times a week." *Id.* at 217, 219. Every time was "very similar," except that she remembered three specific times when something "weird" happened. *Id.* at 220.

The "first time . . . he put his penis inside [her] vagina," she had gone into the living room to watch television, her other family members were not around, and Reyes Juarez came up behind her. *Id.* at 211. She testified, "he made me turn around, and I was facing this huge window and there was this curtain. And he pulled my clothes down, and he just, like, held my mouth closed. And then he put his penis inside of me, and then it just -- I -- I can't remember a lot from beyond that point." *Id.* at 214. She said that he told her to put her clothes back on when he heard her mother's footsteps.

The next incident she remembered happened in Reyes Juarez's bedroom, and she remembered it because he made her get in multiple "different positions." *Id.* at 223. When asked if Reyes Juarez had an erection during this incident, NJV first answered, "Yes." *Id.* at 225. Then

the State asked, "And is it the case that he would be inside you in one position and then stop and have you change position and then do it again?," and NJV said, "Actually, now that I'm thinking, no he didn't." *Id.* It was not clear which question NJV was responding to. The prosecutor asked, "If . . . the question was would he have sex with you in one position and then pause to change position and then continue having sex with you? And I thought your answer was yes, and now it sounds like you have a clarification to make." *Id.* NJV clarified, "I remember he would pause and then, make me get in a different position and then like -- then his penis would go in my vagina again. And then he would pause, and do the same thing." *Id.* at 226.

NJV testified that the third incident she remembered was "different" because after penetrating her vagina, "[Reyes Juarez] shoved his penis inside [her] mouth." *Id.* at 227. She testified that he did not have an erection at that time, and she could not remember whether he had an erection at any other time during the incident.

On cross examination, defense counsel asked, "So [the sexual abuse happened] two or three times a week for five years?" *Id.* at 242. NJV said, "It was a couple times a week. I can't say it was always three times, but it was around that," and it was "[a]round . . . five years." *Id.* She also testified on cross examination that she was not familiar with lubricant and that she did not recall whether Reyes Juarez ever ejaculated.

Defense counsel also brought up topics outside the scope of direct examination, asking, "did I remember correctly that you'd also reported to us, and perhaps to others, that you had cut yourself?" *Id.* at 243. NJV said that she used to cut herself, saying, "there was times where I just couldn't take the pain any more." *Id.*

4

Defense counsel also prompted NJV, "You remember telling either one of the detectives or perhaps us or somebody that you thought that Mr. Juarez had pictures of girls on his phone or that you'd seen a picture of a girl on his phone?" *Id.* at 244-45. NJV then testified that Reyes Juarez "was always texting just random girls" and that he followed "so many . . . young girls" on social media. *Id.* at 245. She did not know how old these girls were, but she said they "looked about [her] age." *Id.*

In support of the defense's case, NJV's father (Reyes Juarez's uncle) testified that he never saw Reyes Juarez and NJV alone together or noticed any suspicious behavior.

Reyes Juarez also testified in his defense, stating that NJV was never in his room and that he never had sexual relations with her.

The defense then recalled NJV and asked her additional questions about her self-harming and her difficulties in school. NJV related this behavior to the abuse that she had experienced, as well as the deaths of two of her friends. She testified, "I was just having . . . so much trouble. I was getting into trouble at school. . . . My mom noticed that I just started, you know, walking away from everything I used to do . . . Like, I was this happy girl, and then I turned into this girl that didn't care." *Id.* at 309.

The State was then able to ask additional questions about how the abuse affected NJV. NJV testified, "I decided I would speak out [ ] because . . . it was just too much to hold in because I had that stress, you know. And I just didn't know what to do. I had the pain of having [my friends] gone and then having to deal with the abuse was just too much." *Id.* at 311.

C.     JURY INSTRUCTIONS

The jury was instructed, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." Clerk's Papers (CP) at 103. It was also instructed:

> The State alleges that the defendant committed acts of rape of a child in the first degree on multiple occasions. To convict the defendant on any count of rape of a child in the first degree, one particular act of rape of a child in the first degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of rape of a child in the first degree.

*Id.* at 110.

The to-convict instruction stated, "To convict the defendant of the crime of rape of a child in the first degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt." *Id.* at 111. Each to-convict instruction specified a different count number, but the elements listed in each instruction, including the time frame, were identical. The to-convict instructions did not state that each count must be supported by an act that is "separate and distinct" from the acts supporting the other counts. These instructions were proposed by the State.

When the trial court reviewed the jury instructions with the parties, Reyes Juarez said that he "[did not] have any comment or issue" with the proposed instructions. RP at 289-90. The State responded, "The one comment I would like to make on the record -- and counsel and I have discussed this, but I just want it on the record that we've discussed it, and that is as to the to-convict instructions." *Id.* at 290.

The prosecutor noted that the instruction "'The State alleges multiple acts and that for any one count the jury has to be unanimous as to [which act has been proved]'" preceded the to-convict

instructions, and he advised, "Because of that, I didn't carry forward the separate and distinct from Counts II and III on Count I and et cetera." *Id.* He explained, "I'm always leery of introducing a comment on the evidence unintentionally and I think with that instruction and with our arguments, it'll be clear that we're relying on three separate acts. I just wanted to make sure we do agree that that's the appropriate way to cast the instructions." *Id.* Defense counsel responded, "I informed [the State] to defer to the Court on that." *Id.* The trial court determined that the instructions would "work as written." *Id.* at 291.

D.     CLOSING ARGUMENTS

In its closing argument, the State reminded the jury, "And as I discussed in opening statement, they are all three the same charge. They do not, however, all relate to the same specific act." *Id.* at 330. The State argued, "[A]lthough [NJV] testified as to many different encounters over the course of these five or six years, she gave very specific testimony about three different incidents that stand out for specific reasons . . . and those each are going to relate to one of the three counts that are before you." *Id.* at 333. It explained, "The State has elected to file three counts of Rape of a Child in the First Degree and that is because of [NJV's] testimony of three very specific instances out of these many." *Id.* at 342.

In reviewing the instruction that for each count "one particular act of rape of a child in the first degree must be proved beyond a reasonable doubt and you must unanimously agree as to which act has been proved," the State explained:

> you have to be careful . . . [because if] four of you believe that the elements are satisfied, believe that what she says happened to her happened to her on number I, but not II or III, and a different four of you believe that number II is proved but not I or III, and a different four of you believe that number III is proved but not I or II, you don't have a unanimous verdict on any one count, even though 12 of you may

7

agree that the defendant in some sense committed an act of Child Rape in the First Degree.

*Id.* at 342-43.

The State first described NJV's testimony of a time when "she was alone in the living room and Mom was outside and people were not around, and the defendant removed her pants and removed his pants and penetrated her vagina with an erect penis." *Id.* at 344.

"Secondly, on a later time and in a distinct act that stands out in her memory based upon the specific circumstances . . . being that it was a much longer duration of an episode and that it involved the defendant ordering her, telling her, or placing her in several different positions where he would have vaginal sex with her . . . That's rape of a child." *Id.*

The State then recalled "the third episode that [NJV] described . . . and the reason it stands out is because it's the only time in her memory that during an act of sexual intercourse, penis-vagina, the defendant ultimately forced his penis into her mouth." *Id.* at 344-45.

Finally, the State referred to the instruction that the jury is satisfied beyond a reasonable doubt if it has an abiding belief in the truth of the charges. The State advised:

> I will leave to you to work out what that means to you as a panel, but I would suggest to you that an abiding belief is one that . . . if you think about a Dateline or a 20/20 episode where, you know, you would watch . . . the beginning of the show and they sort of give you one side of the story and you're kind of wondering why this even merits a television show because it seems pretty obvious what happened. And then they might start giving the other side of the story after the first major commercial break. And then you're thinking, like, gosh, nothing is as I thought it was. There is a whole other side to this. And then there is a wrap-up. And ultimately in the end -- perhaps not, but typically, people form an opinion on what they believe happened, what's -- what was proved.
> And that's a lot like what this is like. That's what . . . I would suggest to you, an abiding belief is.

*Id.* at 347. Defense counsel did not object.

Defense counsel brought up the concept of reasonable doubt in his own closing argument. He reminded the jury that "the defendant is presumed innocent" and then shared "the reasons [he] found for reasonable doubt." *Id.* at 349.

To suggest that the jury should doubt NJV's testimony, defense counsel argued that because NJV testified to being assaulted over a period of approximately six years, approximately three times per week, "that equals 156 times a year. And over that time period that the State is alleging, that's over 936 times. And there was no physical trauma. That would seem suspicious that there is no physical trauma to a child sexual part having that much sex." *Id.*

Counsel added, "She reported different disorders. She reported an eating disorder.[1] She reported cutting. She reported her attitude at school changed. She reported that her grades dropped. None of this was supported." *Id.* at 350. He suggested, "you didn't hear any testimony from anybody that supported those assumptions. And there would have been people that noticed that, may[be] not necessarily [the] cutting, but the school, the grades, her attitude. You heard nothing that supports that, and so that's a basis for reasonable doubt." *Id.*

He also argued, "[NJV] told law enforcement . . . she had seen other children on his phone. That was never investigated. That might substantiate the State's case if they had seized his cell phone." *Id.* at 351-52. He commented, "You would think that they would do it for a public safety reason; but besides that, . . . her testimony is not supported by the investigation, I guess, is the point I'm trying to make. *Id.* at 352.

---

[1] NJV did not testify to having an eating disorder.

Defense counsel then conceded that the State had established all of the elements of the crime, except for whether or not there was sexual intercourse. He told the jury, "[T]here is not enough evidence for you to be able to conclude beyond a reasonable doubt that Mr. Juarez is guilty," but he did not go through each of the three instances that the State described in any detail. *Id.* at 354.

At the very end of the State's rebuttal argument, it again reminded the jury, "Make sure that you are all . . . unanimous as to each count . . . each count relates to the three specific acts, not hundreds, not dozens. . . . we've identified three different separate and distinct acts. You . . . have to be all 12 unanimous as to each act, one of which relates to each count." *Id.* at 367.

The jury found Reyes Juarez guilty of all three counts.

## ANALYSIS

### I. DOUBLE JEOPARDY

Reyes Juarez argues his convictions violate double jeopardy because the jury was not instructed that it had to unanimously agree on a separate and distinct act for each count. The State first argues that Reyes Juarez invited any error because he deferred to the trial court on the propriety of the State's proposed jury instructions. On the merits, the State argues that it "specified three clearly distinguishable incidents that corresponded to each of the three counts." Br. of Resp't at 9-10.

The instructional error was not invited and, therefore, it may be reviewed on appeal. The jury instructions were inadequate, but we hold that there was no double jeopardy violation because it was still manifestly apparent to the jury that Reyes Juarez was charged based on three separate and distinct acts.

A.     INVITED ERROR

Claims of double jeopardy violations may be raised for the first time on appeal. *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011). The invited error doctrine precludes judicial review "only where the defendant engaged in some affirmative action by which he knowingly and voluntarily set up the error." *State v. Phelps*, 113 Wn. App. 347, 353, 57 P.3d 624 (2002). For example, if the defendant requested or proposed a particular instruction at trial, then the defendant cannot challenge that instruction as erroneous on appeal. *State v. Henderson*, 114 Wn.2d 867, 868, 792 P.2d 514 (1990).

Reyes Juarez did not request or propose the instructions that are now contested. He merely deferred to the trial court on the propriety of the State's proposed instructions. That deference was not a sufficiently "affirmative action" to preclude this court's review on appeal. *Phelps*, 113 Wn. App. at 353. We may review his double jeopardy claim for the first time on appeal. *Mutch*, 171 Wn.2d at 661.

B.     INSTRUCTIONAL ERROR

1.     LEGAL PRINCIPLES

Where the adequacy of specific jury instructions is challenged, "we review the challenged instructions de novo in the context of the instructions as a whole." *State v. Imokawa*, 194 Wn.2d 391, 396, 450 P.3d 159 (2019). The "jury instructions 'must more than adequately convey the law. They must make the relevant legal standard manifestly apparent to the average juror.'" *State v. Borsheim*, 140 Wn. App. 357, 366, 165 P.3d 417 (2007) (quoting *State v. Watkins*, 136 Wn. App. 240, 241, 148 P.3d 1112 (2006)).

The Washington Supreme Court has held that where the defendant is charged with multiple counts of the same offense, and the to-convict instructions are "nearly identical," the jury instructions are flawed if they do not include an instruction stating that "each count must be based on a separate and distinct criminal act." *Mutch*, 171 Wn.2d at 662. This flaw cannot be remedied by an instruction that each count charges a separate crime because that instruction "still fails to 'inform[ ] the jury that each "crime" require[s] proof of a different act.'" *Id.* at 663 (first alteration in original) (quoting *Borsheim*, 140 Wn. App. at 367). And the flaw cannot be remedied by an instruction that the jury must reach a unanimous verdict, unless the instruction specifically states that the jury "'must unanimously agree that at least one particular act has been proved beyond a reasonable doubt *for each count*.'" *Borsheim*, 140 Wn. App. at 369 (quoting *State v. Ellis*, 71 Wn. App. 400, 402, 859 P.2d 632 (1993)); *see also Mutch*, 171 Wn.2d at 663.

However, this deficiency is not a per se double jeopardy violation; "it simply means that the defendant *potentially* received multiple punishments for the same offense." *Mutch*, 171 Wn.2d at 663. To determine whether a double jeopardy violation actually occurred, we must consider "the evidence, arguments, and instructions" and "look at all the facts of the case." *Id.* at 664-65. Where the jury is not given a "separate and distinct acts" instruction, there is a double jeopardy violation "if it is not clear that it was '*manifestly apparent* to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act." *Id.* at 664. (alteration in original) (quoting *State v. Berg*, 147 Wn. App. 923, 931, 198 P.3d 529 (2008)); *see also State v. Sanford*, 15 Wn. App. 2d 748, 753-54, 477 P.3d 72 (2020).

In *Mutch*, the defendant was charged with five counts of rape. The to-convict instructions for the five counts "were nearly identical, including that they all indicated the same time of

occurrence of the criminal conduct, . . . [and n]one expressly stated that the jury must find that each charged count represents an act distinct from all other charged counts." 171 Wn.2d at 662. The supreme court determined that these jury instructions were insufficient because they did not include a "separate and distinct" instruction. *Id.* at 663.

Yet, the supreme court described *Mutch* as "a rare circumstance where, despite deficient jury instructions, it is nevertheless manifestly apparent that the jury found him guilty of five separate acts." *Id.* at 665. In reaching this conclusion, the court recognized that the victim "testified to five separate episodes of rape . . . [and] the defense did not focus on challenging her account of how many sexual acts occurred." *Id.* Additionally, "The State discussed all five episodes of rape in its arguments, and the defense did not argue insufficiency of evidence as to the number of alleged criminal acts or question [the victim's] credibility regarding the number of rapes." *Id.*

More recently, the supreme court again determined that it was "manifestly apparent" that a jury found the defendant guilty of separate and distinct acts despite deficient instruction where "the prosecution made a point to clearly distinguish between the acts" and the State presented the charges with "clarity in . . . closing argument." *State v. Peña Fuentes*, 179 Wn.2d 808, 825-26, 318 P.3d 257 (2014). The court also noted in *Peña Fuentes* that "the defendant did not challenge the number of acts or whether the acts overlapped; he challenged only [the victim's] believability." *Id.*

2.   APPLICATION

Here, the to-convict instructions were identical except for the count number, and they did not include language specifying that each count must be based on a "separate and distinct" act. No other instruction included this language either. The absence of this language was a defect in the

13

jury instructions. *Mutch*, 171 Wn.2d at 663. The inclusion of other instructions explaining that separate counts had been charged and that the jury must be unanimous did not cure the defect. *See id.*

This does not end the inquiry, however. Based on the evidence presented and the State's arguments, "it was 'manifestly apparent to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act." *Id.* at 664 (emphasis omitted) (alteration in original) (quoting *Berg*, 147 Wn. App. at 931).

The State began the trial by informing the jury, "Despite the fact that . . . this sexual intercourse, this sexual contact, occurred frequently over a period of several years[, NJV] will be able to identify and describe for you three specific instances," and it previewed the testimony for those three specific instances. RP at 142-43.

NJV then testified about three specific instances and explained that she remembered these incidents in more detail because something "weird" happened in each of them. *Id.* at 220. In the first one, the rape occurred in the living room, rather than in Reyes Juarez's bedroom. In the second one, Reyes Juarez forced NJV into multiple different positions. And in the third one, Reyes Juarez forced his penis into NJV's mouth, which he had not done before. The State briefly reviewed these three instances during its closing argument.

The State also clarified during its closing argument that each count related to a separate and distinct act. It explained, "[NJV] gave very specific testimony about three different incidents that stand out for specific reasons . . . and those each are going to relate to one of the three counts that are before you." *Id.* at 333. Later on in the argument, the State again reiterated, "The State has elected to file three counts of Rape of a Child in the First Degree and that is because of [NJV's]

14

testimony of three very specific instances out of these many." *Id*. at 342. And in its rebuttal, the State concluded, "we've identified three different separate and distinct acts. You . . . have to be all 12 unanimous as to each act, one of which relates to each count." *Id.* at 367. As in *Peña Fuentes*, "the prosecution made a point to clearly distinguish between the acts," and the State presented the charges with "clarity in . . . closing argument." 179 Wn.2d at 825-26.

Moreover, although NJV testified that Reyes Juarez would sexually abuse her "any time he got a chance," and that it would occur "a couple times a week," NJV never testified to any other incidents with specificity. RP at 217, 219. She only gave detailed testimony about three instances, which aligned with the State's three charges.

Defense counsel mentioned the alleged number of rapes in his closing argument, claiming NJV's estimates would suggest it occurred "over 936 times." *Id.* at 349. But counsel was challenging NJV's credibility in general, suggesting that it was "suspicious that there is no physical trauma." *Id.* Defense counsel did not raise this fact as a way of challenging the number of charges that the State brought.

Considering the evidence and the arguments presented, we hold that it was manifestly apparent to the jury that each of the three counts charged was based on a separate and distinct act. There was no double jeopardy violation.[2]

---

[2] Reyes Juarez cites *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984), *abrogated in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988), in his brief, suggesting that the trial court's giving of a *Petrich* instruction compounded the error of the trial court's failure to instruct the jury that its decision on each count should be based on a separate and distinct act. However, *Petrich* deals with lack of juror unanimity, not double jeopardy. *See Petrich*, 101 Wn.2d at 569-73. Reyes Juarez fails to explain how the trial court's *Petrich* instruction, to which he did not object, resulted in or compounded the double jeopardy error.

## II. PROSECUTORIAL MISCONDUCT

Reyes Juarez argues the prosecutor minimized the State's burden of proof when he "equated being convinced beyond a reasonable doubt with the level of certainty one develops after watching an investigative TV show." Br. of Appellant at 30. Reyes Juarez further argues that a curative instruction would not have cured the prejudice because "the 'abiding belief' in the instruction on reasonable doubt is undefined" and "once the improper example was given, the jury had an indelible impression of how casual the reasonable doubt standard was to be viewed." *Id.* at 34.

We agree that the prosecutor's argument analogizing the reasonable doubt standard to an opinion about a television show was improper. However, Reyes Juarez waived any error by failing to object below.

A.    LEGAL PRINCIPLES

To establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). If a defendant successfully shows that the prosecutor's conduct was improper, then this court must determine whether the improper conduct prejudiced the defendant. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

"Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct." *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014). In *Lindsay*, the supreme court cautioned that analogizing the reasonable doubt standard "to everyday experiences trivializes the State's burden of proof and is improper." *Id.* at 436. We have also explained that "[a] jury's job is not to 'solve' a case. . . .

16

Rather, the jury's duty is to determine whether the State has proved its allegations against a defendant beyond a reasonable doubt." *State v. Anderson*, 153 Wn. App. 417, 429, 220 P.3d 1273 (2009).

But where the defendant fails to object to alleged prosecutorial misconduct, "the defendant is deemed to have waived any error," unless he shows that the misconduct was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. The defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *Thorgerson*, 172 Wn.2d at 455).

B.      APPLICATION

In closing argument, the prosecutor suggested that an "abiding belief" is similar to when "people form an opinion on what they believe happened" after watching an episode of Dateline or 20/20 on television. RP at 347.

This was an improper description of the State's burden of proof. The analogy trivialized the State's burden by comparing it to the everyday experience of watching a television show. It also improperly suggested that the jury should decide the case based on its hunch of whether the defendant was guilty, rather than hold the State to its burden of proving each element beyond a reasonable doubt.

It is possible the prosecutor was merely attempting to remind the jury that it would be improper to decide a case before both sides had been provided a full opportunity to present their respective cases. However, the prosecutor concluded this portion of his argument by saying, in

reference to the television show, that the jury's decision on guilt was similar to the decision it would make at the conclusion of the television show. This was improper.

Nevertheless, Reyes Juarez did not object to this argument, and he cannot now show that the misconduct was so flagrant and ill intentioned that the trial court could not have cured any resulting prejudice. Reyes Juarez is correct that the instructions do not specifically define "abiding belief," but the trial court could have repeated its instruction defining reasonable doubt and reminded the jury that "[t]he State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements." CP at 104.

Additionally, the prejudicial effect here is minimized by the fact that defense counsel discussed the reasonable doubt standard in his own closing argument. Moreover, the impropriety was brief, and the prosecuting attorney's argument was otherwise proper.

The prosecutor's "abiding belief" analogy was improper, but Reyes Juarez waived any error by failing to object. He was not deprived of a fair trial.

### III. SUFFICIENCY OF THE EVIDENCE

Reyes Juarez next argues that the State presented insufficient evidence to sustain his convictions on counts II and III because NJV's testimony was the State's only evidence and it "consisted of general, and at times, contradictory statements." Br. of Appellant at 36. We disagree.

A.     LEGAL PRINCIPLES

The State must prove every element of the charged offense beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). When reviewing a claim of insufficient evidence, we ask whether a rational trier of fact could find that the State proved all of the crime's

essential elements beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). We accept the State's evidence as true and draw all reasonable inferences from the evidence in the light most favorable to the State. *Id.* at 265-66. "Credibility determinations are for the trier of fact and are not subject to review." *State v. Mines*, 163 Wn.2d 387, 391, 179 P.3d 835 (2008).

"A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim." Former RCW 9A.44.073(1) (1988). "'Sexual intercourse' . . . occurs upon any penetration, however slight." RCW 9A.44.010(1)(a).

B.     APPLICATION

Reyes Juarez's primary contention is that NJV's testimony was insufficient because it was "general, and at times, contradictory." Br. of Appellant at 36. But NJV's credibility as a witness was for the jury to decide. The jury found NJV credible, and we do not review their determination on appeal. *Mines*, 163 Wn.2d at 391.

Reyes Juarez's other arguments are disconnected from the elements of the crime. The State was not required to corroborate NJV's testimony, nor was it required to provide evidence of her "collateral suffering." Br. of Appellant at 36. The State also did not need to prove that Reyes Juarez had an erection. Sexual gratification is not an element of the crime of rape of a child because the essential element is sexual intercourse, which "occurs upon any penetration." RCW 9A.44.010(1)(a); *see also* former RCW 9A.44.073(1).

The State needed to prove that Reyes Juarez had sexual intercourse with NJV. Reyes Juarez conceded that the State had proved the other elements of the crime in his closing argument. The State offered proof of three separate instances of sexual intercourse through NJV's testimony. NJV testified that the first time Reyes Juarez "put his penis inside [her] vagina," she had gone into the living room to watch television and Reyes Juarez came up behind her. RP at 211. She then testified to another incident where Reyes Juarez raped her in multiple "different positions." *Id.* at 223. And she described a third incident when "[Reyes Juarez] shoved his penis inside [her] mouth" after penetrating her vagina. *Id.* at 227. All three of Reyes Juarez's convictions are supported by sufficient evidence.

## IV. ASSISTANCE OF COUNSEL

Reyes Juarez argues his trial counsel provided ineffective assistance by eliciting "damaging" testimony from NJV describing "an abundance of collateral suffering" and images of other girls she had seen on Reyes Juarez's cell phone. Br. of Appellant at 42. Reyes Juarez also argues that his counsel's failure to object to the prosecutor's improper analogy during closing argument was deficient and prejudicial.

On this record, Reyes Juarez cannot demonstrate an absence of legitimate trial strategy during his counsel's examinations of NJV. Further, counsel's failure to object during the State's closing argument was not so egregious that it might have impacted the outcome of the proceedings.

### A.   LEGAL PRINCIPLES

Effective assistance of counsel is guaranteed under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To succeed on a claim of ineffective assistance of counsel,

the defendant must show both deficient performance and resulting prejudice. *Id.* at 457-58. Deficient performance is performance that "falls 'below an objective standard of reasonableness.'" *Id.* at 458 (quoting *State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995)). Prejudice is "a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Id.* (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). "[A] failure to show either prong will end the inquiry." *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

On appeal, we presume that counsel's performance was adequate and give "exceptional deference . . . when evaluating counsel's strategic decisions." *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). "If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim." *Id.* The defendant bears the burden of showing "the absence of any conceivable legitimate tactic." *Classen*, 4 Wn. App. 2d at 541.

However, when attempting to demonstrate the absence of legitimate trial strategy on direct appeal, the defendant is limited to facts that are within the trial record. *State v. Linville*, 191 Wn.2d 513, 525, 423 P.3d 842 (2018). Therefore, although both parties may hypothesize about defense counsel's strategic motivations, if the record does not include evidence showing the reasons behind counsel's decisions, "it is impossible to tell whether [one] hypothesis—or any others—is correct." *Id.* "'If a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition.'" *Id.* (quoting *McFarland*, 127 Wn.2d at 335).

Because the decision of whether to object is a "classic example[] of trial tactics," counsel's failure to object will justify reversal "[o]nly in egregious circumstances, on testimony central to

21

the State's case." *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541, *review denied*, 193 Wn.2d 1038, 449 P.3d 664 (2019).

B.    APPLICATION

1.    EXAMINATIONS OF NJV

Reyes Juarez's counsel elicited testimony from NJV that arguably bolstered the State's case rather than his own. Defense counsel asked NJV about self-harming and troubles in school, which she connected back to the sexual abuse that she suffered. Defense counsel also asked about pictures that NJV had apparently seen on Reyes Juarez's phone of other young girls, which could have suggested to the jury that there were other victims, or that Reyes Juarez was a "predatory pedophile." Br. of Appellant at 44.

The State contends that Reyes Juarez's trial counsel's strategy was to "draw out certain information from [NJV] about her mental health . . . to undermine her credibility" and to "impl[y] that [NJV's] uncorroborated claims [of] various disorders were exaggerated or fabricated, as were her other allegations against the defendant." Br. of Resp't at 23.

However, the trial record is silent as to counsel's reasons for asking NJV these questions. On this record, it is "impossible to tell" whether Reyes Juarez's or the State's hypothesis is correct. *Linville*, 191 Wn.2d at 525. Therefore, Reyes Juarez fails to show an absence of legitimate trial strategy.

2.    FAILURE TO OBJECT TO CLOSING ARGUMENT

As we note above, the decision whether to object is generally left to the discretion of counsel, and this decision will only be disturbed in egregious circumstances. Although the prosecutor's argument regarding reasonable doubt was improper, it was not so egregious that we

22

could conclude counsel performed deficiently in choosing not to object. Further, defense counsel addressed the reasonable doubt standard in his own closing argument. He reminded the jury that "the defendant is presumed innocent" and shared "the reasons [he] found for reasonable doubt." RP at 349. Reyes Juarez does not show a reasonable probability that, but for his counsel's deficient performance, the outcome of the proceedings would have been different. *Estes*, 188 Wn.2d at 458.

## V. CUMULATIVE ERROR

Finally, Reyes Juarez contends that an accumulation of errors deprived him of a fair trial in violation of the Sixth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution. We disagree.

### A. LEGAL PRINCIPLES

"Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant [their] right to a fair trial, even if each error standing alone would be harmless." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

### B. APPLICATION

Reyes Juarez's trial contained errors. However, the errors were few, and they had little or no effect on the outcome at trial. The jury instructions were erroneous, yet the jury's role was still made manifestly apparent. The prosecutor trivialized his burden of proof during closing argument, and defense counsel failed to object, but this was a brief and isolated instance of misconduct, and defense counsel addressed the burden of proof in his own closing argument. The combined effect of these errors did not deny Reyes Juarez his right to a fair trial.

No. 53592-1-II

CONCLUSION

We hold that although the jury instructions were inadequate, Reyes Juarez was not subjected to multiple punishments for the same offense in violation of double jeopardy. Additionally, although the prosecutor's "abiding belief" analogy was improper, any prejudice was curable; thus, Reyes Juarez has waived this claim. Also, all of Reyes Juarez's convictions were supported by sufficient evidence, he fails to show ineffective assistance on this record, and cumulative errors did not deprive him of a fair trial. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

WORSWICK, J.

LEE, C.J.

24